# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

MARTIN KENDALL, Individually and on Behalf of All Others Similarly Situated,

    Plaintiff,

v.

SNYDER'S-LANCE, INC., JAMES W. JOHNSTON, BRIAN J. DRISCOLL, JEFFREY A. ATKINS, PETER P. BRUBAKER, C. PETER CARLUCCI, JR., JOHN E. DENTON, LAWRENCE V. JACKSON, DAVID C. MORAN, DAN C. SWANDER, ISAIAH TIDWELL, and PATRICIA A. WAREHIME,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff Martin Kendall ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.    This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Snyder's-Lance, Inc. ("Snyder's-Lance" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Snyder's-Lance, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100 in connection with the proposed merger (the "Proposed Merger") between Snyder's-Lance and certain affiliates of Campbell Soup Company ("Campbell").

- 1 -

2.     On December 18, 2017, the Board caused the Company to enter into an agreement and plan of merger (the "Merger Agreement"), pursuant to which the Company's shareholders stand to receive $50.00 in cash for each share of Snyder's-Lance stock they own (the "Merger Consideration"), for a value of approximately $4.87 billion.

3.     On January 17, 2018, in order to convince Snyder's-Lance shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading preliminary proxy statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.   The materially incomplete and misleading Proxy independently violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. 240.14a-9), each of which constitutes a violation of Section 14(a) and 20(a) of the Exchange Act.

4.     While touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially incomplete and misleading.

5.     In particular, the Proxy contains materially incomplete and misleading information concerning the financial projections for the Company that were prepared by the Company and relied upon by the Board in recommending the Company's shareholders vote in favor of the Proposed Merger.   The financial projections were also utilized by Snyder's-Lance's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs"), in conducting the valuation analyses in support of its fairness opinion.

6.      It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the forthcoming shareholder vote to allow the Company's shareholders to make an informed decision regarding the Proposed Merger.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of (i) Regulation G (17 C.F.R. § 244.100) and (ii) Rule 14a-9 (17 C.F.R. 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless, and until, the material information discussed below is disclosed to Snyder's-Lance shareholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Snyder's-Lance is incorporated in this District.

## PARTIES

11.    Plaintiff is, and at all relevant times has been, a holder of Snyder's-Lance common stock.

12.    Defendant Snyder's-Lance is incorporated in North Carolina and maintains its principal executive offices at 13515 Ballantyne Corporate Place, Charlotte, North Carolina 28277. The Company's common stock trades on the NASDAQ under the ticker symbol "LNCE."

13.    Individual Defendant James W. Johnston has served as Chairman of the Board since 2016 and as a director of the Company since 2008.

14.    Individual Defendant Brian J. Driscoll has served as Chief Executive Officer since 2017, and as a director of the Company since 2016.

15.    Individual Defendant Jeffrey A. Atkins has served as a director of the Company since 2006.

16.    Individual Defendant Peter P. Brubaker has served as a director of the Company since 2010.

17.    Individual Defendant C. Peter Carlucci, Jr. has served as a director of the Company since 2010.

18.    Individual Defendant John E. Denton has served as a director of the Company since 2010.

19.    Individual Defendant Lawrence V. Jackson has served as a director of the Company since 2015.

20.    Individual Defendant David C. Moran has served as a director of the Company since 2015.

21.     Individual Defendant Dan. C. Swander has served as a director of the Company since 2004.

22.     Individual Defendant Isaiah Tidwell has served as a director of the Company since 1995.

23.     Individual Defendant Patricia A. Warehime has served as a director of the Company since 2010.

24.     The Individual Defendants referred to in paragraphs 13-23 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Snyder's-Lance (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

26.     This action is properly maintainable as a class action because:

        a.     The Class is so numerous that joinder of all members is impracticable. As of January 17, 2018, there were approximately 97,865,035 shares of Snyder's-Lance common stock outstanding, held by hundreds of individuals and entities scattered throughout the country. The actual number of public shareholders of Snyder's-Lance will be ascertained through discovery;

        b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i) whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii) whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

iii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv) whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I. The Proposed Merger

27. Snyder's-Lance manufactures and markets snack foods throughout the United States and internationally. Snyder's-Lance's products include pretzels, sandwich crackers, pretzel crackers, potato chips, cookies, tortilla chips, restaurant style crackers, popcorn, nuts and other snacks. Products are sold under the Snyder's of Hanover, Lance, Kettle Brand, KETTLE Chips, Cape Cod, Snack Factory Pretzel Crisps, Pop Secret, Emerald, Late July, Krunchers!, Tom's, Archway, Jays, Stella D'oro, Eatsmart Snacks, O-Ke-Doke, Metcalfe's skinny brands and other brand names, along with a number of third-party brands. Products are distributed nationally through grocery and mass merchandisers, convenience stores, club stores, food service outlets, and other channels.

28. On December 18, 2017, Snyder's-Lance and Campbell issued a joint press release announcing the Proposed Merger, which states in pertinent part:

> CAMDEN, N.J. & CHARLOTTE, N.C.--(BUSINESS WIRE)--Campbell Soup Company (NYSE: CPB) and Snyder's-Lance (NASDAQ: LNCE) today announced that the companies have entered into an agreement for Campbell to acquire Snyder's-Lance for $50.00 per share in an all-cash transaction. The purchase price represents a premium of approximately 27 percent to Snyder's-Lance's closing stock price on Dec. 13, 2017, the last trading day prior to media reports regarding a potential transaction. The acquisition, which has been approved by the Boards of Directors of both companies, will enable Campbell to expand its portfolio of leading snacking brands.
>
> Snyder's-Lance is a leading snacking company that manufactures and markets snack food throughout the United States. The company's portfolio includes well-

known brands such as Snyder's of Hanover, Lance, Kettle Brand, KETTLE chips, Cape Cod, Snack Factory Pretzel Crisps, Pop Secret, Emerald and Late July. Snyder's-Lance has leading market positions in its core categories including pretzels, sandwich crackers, kettle chips, deli snacks and organic and natural tortilla chips.[1]

**Acquisition and Snyder's-Lance Highlights:**

- Combines the strengths of both organizations to drive sales growth and expand Campbell's footprint in the $89 billion U.S. snacking market, which had a three-year compound annual growth rate (CAGR) of nearly 3 percent[2]
- Snyder's-Lance reported $2.2 billion in net sales for the trailing 12 months ended Sept. 30, 2017
- From calendar 2012-2016, Snyder's-Lance net sales grew at an 11.5 percent CAGR; organic net sales outpaced category growth with a 4 percent CAGR

The acquisition of Snyder's-Lance will accelerate Campbell's access to faster-growing distribution channels including the convenience and natural channels.

**Strengthening Campbell's Portfolio in Faster-Growing Categories**

Denise Morrison, Campbell's President and Chief Executive Officer, said, "The acquisition of Snyder's-Lance will accelerate Campbell's strategy and is in line with our Purpose, 'real food that matters for life's moments.' It will provide our consumers with an even greater variety of better-for-you snacks. The combination of Snyder's-Lance brands with Pepperidge Farm, Arnott's and Kelsen will create a diversified snacking leader, drive sales growth and create value for shareholders. This acquisition will dramatically transform Campbell, shifting our center of gravity and further diversifying our portfolio into the faster-growing snacking category. We look forward to welcoming Snyder's-Lance's employees and their trusted family of leading brands to our company."

Campbell's baked snacks product portfolio generated approximately $2.5 billion in net sales in fiscal 2017. With the addition of Snyder's-Lance's complementary portfolio, snacking would represent approximately 46 percent of Campbell's annual net sales (previously 31 percent) on a pro forma basis. Campbell's soup portfolio, including the recent acquisition of Pacific Foods, would represent approximately 27 percent of the company's annual net sales.

Brian J. Driscoll, President and Chief Executive Officer of Snyder's-Lance, said, "Following a thorough review process of strategic options, we believe this transaction maximizes value for our shareholders through an immediate and certain cash premium. The transaction also unlocks the value of our portfolio, reflecting the progress we have made planning and executing our transformation. We are excited to join Campbell and to continue to provide great products to our consumers with an uncompromising focus on ingredients, quality and taste."

29.     The Merger Consideration appears inadequate in light of the Company's recent financial performance and prospects for future growth.  More specifically, the Company has reported steadily increasing Sales Growth, Gross Income Growth, and EBITDA growth since 2014, reporting double-digit growth in each of those metrics in 2016.  Moreover, the Company reported *triple-digit increases* in Total Assets Growth in 2016.

30.     In sum, it appears that Snyder's-Lance is well-positioned for financial growth, and that the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Merger.

## II.     The Materially Incomplete and Misleading Proxy

31.     On January 17, 2018, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *Financial Projections that Violate Regulation G and SEC Rule 14a-9*

32.     The Proxy discloses certain financial projections for the Company on pages 42-43 of the Proxy.  However, the Proxy fails to provide material information concerning the Company's

financial projections, which were developed by the Company's management and relied upon by the Board in recommending that the shareholders vote in favor of the Proposed Merger. Proxy 42.

33. Specifically, the Proxy provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics such as EBITDA, but fails to provide: (i) the line items used to calculate these non-GAAP measures, or (ii) a reconciliation of these non-GAAP metrics to their most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a). Proxy 43.

34. When a company discloses non-GAAP financial measures in a proxy statement that were relied on by a board of directors to recommend that shareholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

35. As a non-GAAP measure, EBITDA is a highly subjective financial metric that can vary wildly from company to company, and even from period to period within the same company. This makes SEC-required reconciliation all the more necessary for shareholders to be able to fairly evaluate a company. As Warren Buffett explained in a letter to Berkshire Hathaway stockholders in 2001: "References to EBITDA make us shudder — does management think the tooth fairy pays for capital expenditures? We're very suspicious of accounting methodology that is vague or unclear, since too often that means management wishes to hide something."

36.    Indeed, the SEC has increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Snyder's-Lance included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.    Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[1]

37.    The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[2] Indeed, the SEC's Division of Corporation Finance released a new and updated Compliance and Disclosure Interpretation ("C&DIs") on the use of non-GAAP financial measures to clarify the extremely narrow and limited circumstances, known as the business combination exemption,

---

[1]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html. (emphasis added)

[2]    *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures:  The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

where Regulation G would not apply.[3]

38.     More importantly, the C&DI clarifies when the business combination exemption does not apply:

> There is an exemption from Regulation G and Item 10(e) of Regulation S-K for non-GAAP financial measures disclosed in communications subject to Securities Act Rule 425 and Exchange Act Rules 14a-12 and 14d-2(b)(2); it is also intended to apply to communications subject to Exchange Act Rule 14d-9(a)(2). This exemption does not extend beyond such communications. Consequently, if the same non-GAAP financial measure that was included in a communication filed under one of those rules is also disclosed in a Securities Act registration statement, proxy statement, or tender offer statement, this exemption from Regulation G and Item 10(e) of Regulation S-K would not be available for that non-GAAP financial measure.

*Id.*

39.     Thus, the C&DI makes clear that the so-called "business combination" exemption from the Regulation G non-GAAP to GAAP reconciliation requirement applies solely to the extent that a third-party such as a financial advisor has utilized projected non-GAAP financial measures to render a report or opinion to the Board. To the extent the Board also examined and relied on internal financial projections to recommend a transaction, Regulation G applies.

40.     Because the Proxy explicitly discloses that the projections were prepared by management and "used by our Board and provided to Campbell in connection with their respective evaluations of the proposed merger," no exemption from Regulation G is applicable. Proxy 42.

41.     Thus, to bring the Proxy into compliance with Regulation G as well as cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 43, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures. At the very least, the Company must disclose

---

[3]     *Non-GAAP Financial Measures*, U.S. Securities and Exchange Commission (Oct. 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm#101. To be sure, there are other situations where Regulation G would not apply but are not applicable here.

the line item projections for the financial metrics that were used to calculate the aforementioned non-GAAP measures.

42.     At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculate the aforementioned non-GAAP measures. Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading. Indeed, the Defendants acknowledge the misleading nature of non-GAAP projections, as Snyder's-Lance shareholders are cautioned in a press release announcing the Company's most recent quarterly financial results that: "[t]he presentation of non-GAAP financial measures by the Company should not be considered in isolation or as a substitute for the Company's financial results prepared in accordance with GAAP."[4]

### *Financial Projections Utilized in the Financial Analyses that Violate SEC Rule 14a-9*

43.     Moreover, certain line items of the projections were also utilized by the Company's financial advisor, Goldman Sachs, to render a report to the Board of its opinion regarding the fairness of the Proposed Transaction. Proxy 44. Specifically, Goldman Sachs, based upon guidance from the Company's management and Management's Projections discussed above, calculated the Company's unlevered free cash flows ("UFCF"). The company defined UFCF as: "EBITDA less depreciation and amortization less taxes (applying a 35% tax rate as reflected in the Company Projections), plus depreciation and amortization, less increase in net working capital less capital expenditures." Proxy 48. However, apart from EBITDA, Goldman Sachs utilized undisclosed line items in its calculation. Proxy 48.[5]

44.     The definition of UFCF is, in and of itself, and separate and apart from the mandates

---

[4]     Snyder's-Lance, Inc., Current Report (Form 8-K), Exhibit 99.1 (Nov. 7, 2017), *available at:*          https://www.sec.gov/Archives/edgar/data/57528/000005752817000025/lnce-8xkq32017earningsrele.htm.

[5]     Plaintiff alleges, based on the clear and plain language of Regulation G, that all non-GAAP internal financial projections that were relied on by the Board must comply with Regulation G, even if Barracuda also utilized those financial projections.

of Regulation G, materially false and/or misleading in violation of SEC Rule 14a-9 (17 C.F.R. 240.14a-9). Because the line items used to calculate UFCF were not disclosed, shareholders are unable to discern the veracity of Goldman Sachs' discounted cash flow ("DCF") analysis. Without further disclosure of the line items used in its UFCF calculation, shareholders are unable to compare Goldman Sachs' UFCF calculations with the Company's financial projections. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

45.     These key inputs are material to Snyder's-Lance shareholders, and their omission renders the summary of Goldman Sachs's DCF valuation analysis incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value… The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

46.     Clearly, shareholders would find this information material since the Board's unanimous recommendation that shareholders vote in favor the Proposed Merger was based, due to the following (in relevant part):

- *Strategic alternatives.* Our Board considered the potential values, benefits, risks and uncertainties facing our shareholders associated with possible strategic alternatives to the merger (including scenarios involving the possibility of remaining independent), and the timing and likelihood of accomplishing certain alternatives. Based on the foregoing, our Board considered that none of these options, on a risk-adjusted basis, was reasonably

likely to create value for our shareholders greater than the merger consideration. . . .

- *Fairness Opinion.* Our Board considered the financial analyses reviewed by Goldman Sachs with the Board and the opinion of Goldman Sachs rendered to the Board to the effect that, as of December 18, 2017 and based on and subject to the factors and assumptions set forth in Goldman Sachs' written opinion, the $50.00 in cash per share to be paid to the holders (other than Campbell and its affiliates) of the shares of Company common stock pursuant to the merger agreement was fair from a financial point of view to such holders. . . .

- *Our Current Condition.* Our Board considered information with respect to our financial condition, results of operation, competitive position and business strategy, on both historical and prospective bases, as well as current industry, regulatory, economic and market conditions, trends and cycles.

- *Our Future Prospects.* Our Board considered our future prospects if we were to remain independent, including the competitive landscape and the business, financial and execution risks, our relationship with customers, distributors and suppliers, and the risks associated with continued independence discussed below. The Board considered the potential impact of the proposed federal tax reform bills on the Company.

Proxy 38-39.

47.    In sum, the Proxy independently violates both (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading. As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Merger from Snyder's-Lance shareholders.

48.    Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the

Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)

49.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

51.     As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a).

52.     The failure to reconcile the numerous non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

## COUNT II

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

53.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

54.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in proxy statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

55.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure and any accompanying discussion of that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading." 17 C.F.R. § 244.100(b).

56.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

57.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were

-17-

therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

58.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.

59.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

60.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

61.     Snyder's-Lance is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

62.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and

omissions are not corrected prior to the vote on the Proposed Merger.

63.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

64.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

65.     The Individual Defendants acted as controlling persons of Snyder's-Lance within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Snyder's-Lance, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

66.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were thus directly involved in preparing the Proxy.

68.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

69.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

70.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

71.     Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding

with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

     C.    Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

     D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

     E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  January 30, 2018

Respectfully submitted,

/s/ Nancy Meyers
Nancy Meyers
NC State Bar 23339
**WARD BLACK LAW**
208 West Wendover Avenue
Greensboro, North Carolina 27401-1307
Tel.: (336) 333-2244
Email: nmeyers@wardblacklaw.com

*Counsel for Plaintiff*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Robert W. Killorin
James M. Wilson, Jr.
3975 Roswell Road, Suite A
Atlanta, GA 30342
Tel.: (404) 847-0617
Email: rkillorin@faruqilaw.com
Email: jwilson@faruqilaw.com

*Counsel for Plaintiff*